IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs September 12, 2007

## ROY NELSON v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Shelby County**
**No. P-28021    W. Otis Higgs, Judge**

---

**No. W2006-01946-CCA-R3-PC  - Filed November 2, 2007**

---

The petitioner, Roy Nelson, appeals the denial of his petition for post-conviction relief, arguing that the post-conviction court erred in finding that he received effective assistance of counsel. Following our review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which DAVID H. WELLES and JOHN EVERETT WILLIAMS, JJ., joined.

James E. Thomas, Memphis, Tennessee, for the appellant, Roy Nelson.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; William L. Gibbons, District Attorney General; and Patience Branham, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTS

In December 2002, the petitioner, who had been indicted by the Shelby County Grand Jury for the first degree premeditated murder of his coworker, pled guilty in the Shelby County Criminal Court to second degree murder and was sentenced as a violent offender to twenty years at 100% in the Department of Correction. On January 5, 2004, he filed a *pro se* petition for post-conviction relief in which he raised a number of claims, including that he was denied the effective assistance of counsel and that his guilty plea was unknowing and involuntary. Following the appointment of post-conviction counsel, he filed an amended petition in which he alleged that trial counsel was ineffective for, among other things, failing to explain the possibility of pursuing an insanity defense and failing to inform him that he had thirty days following the entry of his guilty plea to move the court for leave to withdraw the plea. He additionally alleged that his long history of mental illness,

including a diagnosis of paranoid schizophrenia, combined with counsel's failure to explain the possibility of defenses or mitigation based on his mental history, rendered his guilty plea unknowing and involuntary.

At the evidentiary hearing, trial counsel testified that he was appointed to represent the petitioner sometime in 2000. He said he spoke with the petitioner, reviewed discovery, and retained the services of an investigative firm, "Inquisitor Incorporated," which ultimately uncovered mental health records on the petitioner spanning over thirty years. He stated that the petitioner had given a statement to police and there was no dispute that he was responsible for the victim's death. Trial counsel recalled the facts of the crime:

> The . . . history, as I understood it, between [the petitioner and the victim] was that they worked together, that there was some sort of relationship, either friendly or more, and that she was trying to blackmail him about this relationship, and according to his statement to the police and kind of the allegations made by the police, that he did not know how to deal with her pressure, and at some point snapped and killed her.

Trial counsel explained the focus of his defense "wasn't going to be who did this. It was going to be why was this done."

Trial counsel testified that mental health records uncovered by Glori Shettles, one of the investigators with Inquisitor, revealed that the petitioner's mental health treatment had begun at a very early age. He agreed that the petitioner's mental health history was extensive and included episodes of hallucinations, black-outs, and a diagnosis of paranoid schizophrenia. He said he "felt [the petitioner] was competent but that there was something going on between his ears that [he] wanted to find." He, therefore, requested funding for a forensic evaluation, which was performed by Dr. Joseph Angelillo. In addition, the State later had the petitioner evaluated at Midtown Mental Health Institute. Trial counsel said that the petitioner was determined to be competent to stand trial. He stated that he was satisfied the petitioner was competent at the time he entered his guilty plea.

Trial counsel testified that he did not believe the petitioner's mental problems supported an insanity defense but thought they were sufficient to support an argument on diminished capacity. Both Dr. Angelillo and Dr. Lynn Zager, the State's expert, had concluded that a diminished capacity defense was justified based on the petitioner's mental history and evaluations. Trial counsel acknowledged that he never obtained a neurological consult on the petitioner, despite Dr. Angelillo's suggestion that one might be beneficial. He explained: "At the time he gave this opinion, though, we were using this to try and get this down to either murder two or voluntary manslaughter. They made an offer that [the petitioner] wanted to accept, so that's where that ended." In addition, he did not believe that a neurological consult would have added much to the defense:

> It was my defense theory to pursue diminished capacity, but that's not a defense under the law. What I was hoping to do was to move it from the intent element

required for murder first degree down to one of the lesser includeds. And frankly, our defense theory was that though Dr. Angelillo said perhaps we need a neurological consult, that would have just backed up what he was saying.

As I recall what he was explaining to me, it wasn't that if you do a neurological consult, they're going to give you an MRI that says insanity. They don't have such a thing. We were just going to look for something organic that might back us up. And then we -- I'm not going to say we didn't need it. I guess I'd always rather have more proof than less. We also had the State agreeing with us or the State's expert, if you will, Dr. Zager. So I felt like we were going to get our opinion in front of the jury that said diminished capacity, and then it was a matter of persuasion.

Trial counsel did not agree that the "worst case scenario," had the case gone to trial, would have been a conviction for second degree murder, testifying that in his experience jurors do not care for mental health defenses. He also did not believe that the average juror either understood or cared about the difference between insanity and diminished capacity. In his opinion, the law on insanity had been so "watered down" in Tennessee that a not guilty verdict based on insanity was nearly impossible to reach.

Trial counsel testified that he went over the offer with the petitioner, explaining that he would be pleading guilty to second degree murder and would be sentenced to twenty years at 100% but that his sentence could be reduced as much as 15% for good behavior. He believed that the petitioner understood the offer and everything that it entailed. He could not say that he recommended that the petitioner accept the offer because he was "torn about it." However, he went over the pros and cons of the offer with the petitioner, and the petitioner decided to accept it.

Trial counsel testified that he could not recall having ever told the petitioner that he knew a member of the victim's family. He also could not recall having ever worked at the public defender's office with any member of the victim's family: "I don't think so. Now, you mentioned this to me before, but without knowing their name, I just -- there's like seventy employees there." He said he did not believe that he ever informed the petitioner that he had thirty days to file a motion to withdraw his guilty plea.

On cross-examination, trial counsel testified that he had been practicing criminal law for approximately ten years and had handled "quite a few" first degree murder cases. He agreed that the murder in this case could be characterized as a "somewhat heinous crime" in that the victim's partially nude body, with a cut throat and gunshot and multiple stab wounds, had been found dumped in a ditch area in the median of the interstate. The victim's lack of clothing, in particular, caused him some concern:

The thing I was most concerned about when it came to that, if I'm remembering right, was that [the petitioner] said that he had never had a sexual

-3-

relationship with her. The only way I could ever understand her blackmailing him was to say that he was sexually harassing her or something like that, and he always maintained with me that he had never had a sexual relationship with her. Finding her partially clothed would have cut against that, and that was giving me some concern.

Trial counsel testified that he discussed the case with the petitioner, including the diminished capacity defense. He believed that the petitioner understood despite his history of mental problems. He said that the petitioner was "actually a dream to deal with." The petitioner was calm and respectful and asked questions whenever he did not understand something. Trial counsel stated that the petitioner wanted an offer from the State and that it was his decision to accept the offer. He agreed that both he and the trial court voir dired the petitioner extensively about his decision to plead guilty and said that he believed the petitioner understood what he was doing in entering his plea.

The petitioner testified that he accepted the plea bargain at the recommendation of trial counsel. He said counsel told him he would be required to serve twenty years at 100% but "would get a certain amount of time off for . . . good-behavior." Counsel also promised that he would petition the trial court for the petitioner to be housed in a special needs facility. The petitioner testified that he was currently incarcerated at West Tennessee State Penitentiary in Hennings, which is not a special needs facility. He acknowledged that counsel had lobbied the Department of Correction with respect to his placement in a special needs facility but said that counsel had promised to petition the trial court as well and he did not know if counsel had fulfilled that promise. He said he had investigated his good time credits with the Department of Correction and been told that "[his] time was day for day." Had he known that he would not receive any good time credits, he would not have pled guilty.

The petitioner testified that trial counsel told him after he had entered his plea that he was good friends with the victim's family, but it had not interfered with his representation of the petitioner. The petitioner said he would not have pled guilty had he known of counsel's friendship with the victim's family. He stated that counsel never informed him that he had thirty days in which to file a motion to withdraw his guilty plea. On cross-examination, the petitioner acknowledged that his twenty-year sentence at 100% was mentioned at least five times during his guilty plea colloquy and that he repeatedly said he understood the plea agreement and sentence. He testified, however, that his understanding of the plea agreement was based on what counsel had informed him about it.

On August 11, 2006, the post-conviction court entered an order denying the petition for post-conviction relief. Among other things, the court found that trial counsel's focus on diminished capacity rather than an insanity defense constituted legitimate trial tactics and strategy. The court further found that the petitioner was unable to show prejudice as a result of counsel's failure to inform him of the thirty-day deadline for filing a motion to withdraw his guilty plea. Thereafter, the petitioner filed a timely appeal to this court.

-4-

**ANALYSIS**

The petitioner argues on appeal that trial counsel was ineffective for failing to explain to him the possibility of pursuing an insanity defense and for not informing him of the thirty-day deadline for moving to withdraw his guilty plea. The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f) (2006). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998).

The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed *de novo*, with a presumption of correctness given only to the post-conviction court's findings of fact. Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee cases). The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687, 104 S. Ct. at 2064.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688, 104 S. Ct. at 2065; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the test is satisfied by showing a reasonable probability, *i.e.*, a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 104 S. Ct. at 2068. In the context of a guilty plea, the petitioner must show a reasonable probability that were it not for the deficiencies in counsel's representation, he would not have pled guilty but would instead have insisted on proceeding to trial. Hill v. Lockart, 474 U.S. 52, 59, 106 S. Ct. 366, 370 (1985); House v. State, 44 S.W.3d 508, 516 (Tenn. 2001).

Because both prongs of the test must be satisfied, a failure to show either deficient performance or resulting prejudice results in a failure to establish the claim. See Henley, 960 S.W.2d at 580. For this reason, courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697, 104 S. Ct. at 2069; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

Before a guilty plea may be accepted, there must be an affirmative showing that the petitioner voluntarily and knowingly entered the plea. Boykin v. Alabama, 395 U.S. 238, 242, 89 S. Ct. 1709, 1711 (1969); State v. Pettus, 986 S.W.2d 540, 542 (Tenn. 1999). A plea is not voluntary if it results from ignorance, misunderstanding, coercion, inducements, or threats. Blankenship v. State, 858 S.W.2d 897, 904 (Tenn. 1993). The trial court must determine if the guilty plea is knowing by questioning the defendant to make sure he or she fully understands the plea and its consequences. Pettus, 986 S.W.2d at 542; Blankenship, 858 S.W.2d at 904.

Because the plea must represent a voluntary and intelligent choice among the alternatives available to the defendant, the trial court may look at a number of circumstantial factors in making this determination. Blankenship, 858 S.W.2d at 904. These factors include: (1) the defendant's relative intelligence; (2) his familiarity with criminal proceedings; (3) whether he was represented by competent counsel and had the opportunity to confer with counsel about alternatives; (4) the advice of counsel and the court about the charges against him and the penalty to be imposed; and (5) the defendant's reasons for pleading guilty, including the desire to avoid a greater penalty in a jury trial. Id. at 904-05.

The petitioner contends that trial counsel was deficient for failing to explain to him the possibility of pursuing an insanity defense and that such deficiency rendered his guilty plea unknowing and involuntary. According to the petitioner, it was "clear," based on his mental records and evaluations as well as counsel's failure to have a neurological consult completed, "that an insanity defense was possible, but never pursued." The evidence, however, supports the trial court's finding that counsel's decision not to pursue an insanity defense was based on sound trial strategy and tactics. Trial counsel, who had ten years experience practicing criminal law, testified that he did not believe the elements of an insanity defense could be met but that an argument on diminished capacity could legitimately be made. He said that both Dr. Angelillo and Dr. Zager, the State's witness, agreed that diminished capacity was a viable defense.

Trial counsel testified that he discussed the case, including the concept of diminished capacity, with the petitioner and believed the petitioner understood. He fully discussed the plea bargain agreement with the petitioner, was satisfied that the petitioner was competent to stand trial at the time he entered his plea, and believed that the petitioner understood the nature and consequences of the plea. Based on this evidence, we conclude that the petitioner has not met his burden of demonstrating that trial counsel was deficient for failing to inform him of the possibility

of an insanity defense or that the petitioner would not have pled guilty were it not for counsel's alleged deficiency in this regard.

The petitioner also contends that trial counsel was ineffective for failing to inform him of the thirty-day deadline for filing a motion to withdraw his guilty plea. The petitioner argues that trial counsel's failure to disclose the conflict of interest created by his relationship with the victim's family constitutes the type of "manifest injustice" that would have supported a motion to withdraw his guilty plea. With respect to this claim, the post-conviction court found that the petitioner had failed to show that he was prejudiced as a result of counsel's failure to inform him of the applicable deadline. The record supports the findings and conclusions of the post-conviction court. At the evidentiary hearing, trial counsel could not recall having ever told the petitioner that he knew a member of the victim's family. He was also unable to recall having known or worked with a member of the victim's family, and post-conviction counsel was unable to provide the name of the family member with whom he was alleged to have worked. Thus, even if trial counsel were deficient for failing to inform the petitioner that he had thirty days in which to move to withdraw his plea, the petitioner cannot show that he was prejudiced as a result of this alleged deficiency.

## CONCLUSION

Based on our review, we conclude that the petitioner has failed to show either that trial counsel was ineffective or that his guilty plea was unknowing or involuntary. Accordingly, we affirm the denial of his petition for post-conviction relief.

_____
ALAN E. GLENN, JUDGE